UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL CHICKY,

    Plaintiff,

v.                                                    Case No. 1:17-cv 819
                                                        Hon. Paul L. Maloney

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant,
_____/

**REPORT AND RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration (Commissioner) which denied his claim for disability insurance benefits (DIB).

Plaintiff alleged a disability onset date of April 21, 2003. PageID.114. As discussed, *infra*, this DIB claim involves a closed period from April 21, 2003 through December 31, 2008.[1] Plaintiff identified his disabling conditions as stents, heart catheterization, angina, high cholesterol, high blood pressure, and acid reflux. PageID.698. Prior to applying for DIB, plaintiff completed one year of college and had past employment as an injection mold setter. PageID.126, 699, 703. An administrative law judge (ALJ) reviewed plaintiff's claim *de novo* and entered a written decision denying benefits on July 7, 2016. PageID.114-128. This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

---

[1] This case has a long history since plaintiff filed his application in 2009. In the interest of brevity, the Court will address only those previous proceedings which are relevant to the present appeal.

## I. LEGAL STANDARD

This Court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. § 405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Secretary of Health & Human Services*, 25 F.3d 284, 286 (6th Cir. 1994). A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Services*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only. This Court does not review the evidence de novo, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record. *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence. *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §404.1505; *Abbott v. Sullivan*, 905 F.2d 918, 923

(6th Cir. 1990). In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability. First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four. *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.* If it is determined that a claimant is or is not disabled at any point in the evaluation process, further review is not necessary. *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

## II. ALJ's DECISION

Plaintiff's claim failed at the fifth step of the evaluation. At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 21, 2003 and met the insured status requirements of the Social Security Act through December 31, 2008. PageID.117. At the second step, the ALJ found that through the date last

insured, plaintiff had severe impairments of: coronary artery disease with a history of myocardial infarction and multiple angioplasties and stent placements, and recurrent diarrhea. PageID.117. At the third step, the ALJ found that through the date last insured, plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. PageID.118.

> The ALJ decided at the fourth step that:
>
> On or before December 31, 2008, the claimant had the residual functional capacity to perform a limited range of light work as defined in 20 CFR 404.1567(b): he could not lift and/or carry more than 20 pounds occasionally and 10 pounds frequently; he could not stand and/or walk for more than a total of six hours in an eight-hour workday; and he could not sit for more than a total of six hours in an eight-hour workday. He could not climb ladders, ropes, or scaffolds; he could not climb stairs or ramps more than occasionally; he could not balance, stop, kneel, crouch, or crawl more than frequently; and he could not work with exposure to temperature extremes.

PageID.118. The ALJ also found that through the date last insured, plaintiff was unable to perform his past relevant work. PageID.126.

At the fifth step, the ALJ determined that, through the date last insured, plaintiff could perform a significant number of unskilled jobs at the light exertional level in the national economy. PageID.126-127. Specifically, the ALJ found that plaintiff could perform the requirements of light and unskilled occupations in the national economy such as cashier (500,000 jobs), small product assembler (250,000 jobs), and inspector/hand packager (400,000 jobs). PageID.127. Accordingly, the ALJ determined that plaintiff has not been under a disability, as defined in the Social Security Act, at any time on or before December 31, 2008, the date he last retained insured status. PageID.127-128.

### III. DISCUSSION

Plaintiff set forth four errors on appeal (with numerous subparts):

### A. The ALJ's residual functional capacity (RFC) finding contradicts his severity findings.

Plaintiff contends that the decision is internally inconsistent because the ALJ's RFC determination did not incorporate the severe impairment of recurrent diarrhea. Plaintiff's contention is without merit because "[t]he ALJ is *not* required to incorporate all 'severe impairments' in her RFC assessment." *West v. Colvin*, No. CIV.A. 5:14-69-KKC, 2014 WL 7177925 at *4 (E.D. Ky. Dec. 16, 2014) (emphasis in original).

The RFC determination is a medical assessment of what an individual can do in a work setting in spite of functional limitations and environmental restrictions imposed by all of his medically determinable impairments, 20 C.F.R. § 404.1545, and is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs," 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(c). Here, the ALJ found that plaintiff had the RFC to perform a limited range of light work. PageID.118. Prior to determining the RFC, the ALJ found that plaintiff had severe impairments including recurrent diarrhea. PageID.117. The "severe impairment" determination "has been construed as a *de minimis* hurdle in the disability determination process" which is used "as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988). For this reason:

> A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other.

*Griffeth v. Commissioner of Social Security*, 217 Fed. Appx. 425, 429 (6th Cir. 2007). In this regard, "[t]he regulations recognize that individuals who have the same severe impairment may have different RFCs depending on their other impairments, pain, and other symptoms. 20 C.F.R. § 404.1545(e)." *Id. See, e.g., Weeks v. Commissioner of Social Security*, No. 1:16-cv-121, 2016

5

WL 6067957 at *6 (W.D. Mich. Oct. 17, 2016) ("[t]he Sixth Circuit has rejected the proposition advanced by Plaintiff that an ALJ's RFC determination and hypothetical questions posed to the VE must include a listing of a claimant's severe impairments.").

Furthermore, plaintiff presented conflicting evidence of the extent of his diarrhea and how that condition affected his ability to work during the relevant time period of April 21, 2003 through December 31, 2008. The ALJ summarized plaintiff's most recent testimony as follows:

> He initially testified that he was also experiencing recurrent diarrhea that had started in 2005 "or maybe sooner" for which he was advised to use Immodium and eat a high fiber diet. He reported that he was probably experiencing 12 to 15 bowel movements per day prior to December 31, 2008 and eventually underwent partial removal of his colon due to cancer in November 2009 (after the adjudicatory period). He remarked that the surgery did not resolve his symptoms as he continues to experience recurrent diarrhea. He later stated that he was missing between two and six days of work per month due to his diarrhea when working at Bissell, and that his diarrhea began around 2000 "or earlier."

PageID.120.

The ALJ also pointed out inconsistencies in plaintiff's testimony given in previous hearings and the sparse medical record which indicates that the recurrent diarrhea was not a problem until about May 2008:

> As discussed above, while the evidence of record shows that the claimant complained of recurrent diarrhea on or before December 31, 2008, the record clearly shows that this complaint was minimally reported prior to his visit with his primary-care provider in May 2008. In fact, treatment records from Dr. Enslen contain no annotations regarding a complaint of recurrent diarrhea throughout all of 2007 (Exhibits 28f and 31f). There is certainly no evidence to substantiate the claimant's most recent testimony that he began experiencing diarrhea on a recurrent basis in 2000 "or earlier."

\* \* \*

> Dr. Enslen's records indicate that he attributed the claimant's complaint of diarrhea to his use of Ticlid (Exhibit 22f), yet there is no indication that the claimant made any requests to his cardiologist to try a different cholesterol-lowering

6

> medication prior to December 31, 2008. He also did not indicate that his "recent" diarrhea was a major concern when he sought emergent treatment for his cardiac symptom in July 2008 (Exhibit 18f/p.7). During the period from May 2008, the month he first complained of recurrent diarrhea to Dr. Enslen, through December 31, 2008, the date he last retained insured status, there is no evidence to show that the claimant was prescribed any medication or received specific treatment for diarrhea. He was not referred by Dr. Enslen for any diagnostic testing of his abdomen during this period of time, and there is no evidence that the claimant sought emergent treatment for a complaint of diarrhea during this timeframe.

PageID.123.

       The ALJ continued:

> There is simply no evidence to substantiate the claimant's testimony with respect to the frequency his diarrhea was experienced prior to December 31, 2008. The undersigned is aware that it was suggested by the Appeals Council that the claimant's diarrhea could possibly have been related to his colon cancer that necessitated a hemicolectomy in November 2009; however, his cancer was not discovered until almost a year after the date he last retained insured status. It cannot be presumed that the claimant's diarrhea was attributable to cancer prior to December 31, 2008 especially in light of Dr. Enslen's indication that he suspected the condition to be a side-effect of a specific medication. In addition, Dr. Enslen's treatment notes indicate that the claimant admitted to drinking beer on a daily basis when he first complained of diarrhea in May 2008 (Exhibit 22f/p.16), which could also reasonably be an aggravating factor, especially since he also admitted upon examination at West Michigan Heart in August 2008 that he was drinking one-third to one-half of a pint of whiskey almost nightly (Exhibit 19f/p.6). He admitted to drinking "a few beers a day" and "about one-half of a pint of liquor daily" in January 2005 (Exhibit 19f/p.80).
>
> The undersigned does not doubt that the claimant experienced recurrent diarrhea and symptoms related to coronary artery disease during the period from April 21, 2003 through December 31, 2008; however, the lack of objective corroboration of debilitating functional limitations is inconsistent with his subjective allegations. The undersigned therefore finds the overall evidence, discussed above, persuasive in concluding that the claimant was not precluded from performing all work activity on or before December 31, 2008.

PageID.123-124. In summary, while the ALJ noted that plaintiff had a severe impairment of recurrent diarrhea, this impairment did produce debilitating functional limitations. Accordingly, plaintiff's claim that the ALJ erred by issuing an inconsistent decision should be denied.

### B. The ALJ gave insufficient reasons to reject treater Lojek's opinions.

Plaintiff contends that the ALJ provided insufficient reasons for rejecting the opinions of plaintiff's current cardiologist, M. Lojek, M.D. A treating physician's medical opinions and diagnoses are entitled to great weight in evaluating plaintiff's alleged disability. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). *See* 20 C.F.R. §404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations").

Under the regulations, a treating source's opinion on the nature and severity of a claimant's impairment must be given controlling weight if the Commissioner finds that: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the case record. *See Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375 (6th Cir. 2013); 20 C.F.R. §404.1527(c)(2). Finally, the ALJ must articulate good reasons for not crediting the opinion of a treating source. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004);

8

20 C.F.R. §404.1527(c)(2) ("[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion").

The ALJ provided an extensive evaluation of Dr. Lojek's opinions. Rather than address this evaluation piecemeal, the Court will reproduce the entire evaluation:

> The undersigned accorded limited weight to the opinion offered in March 2011 from Dr. Lojek, the claimant's treating cardiologist, because such is not consistent with his own treatment records or the other evidence of record (Exhibit 27f). The undersigned notes that Dr. Lojek did not offer any assessment of the claimant's capacities for sitting, standing, or lifting but indicated that he could walk for a distance of less than one block. He also commented that the claimant's impairments had been effect since February 2005, would likely produce "good days" and "bad days," and would likely cause an absence from work "more than four times a month." He further stated that the claimant was "incapable of even low stress jobs," that his cardiac symptoms frequently interfere with attention / concentration, and that they cause "marked limitation of physical activity as demonstrated by fatigue, palpitation, dyspnea, or angina discomfort on ordinary physical activity."
>
> The undersigned notes that the indication of being able to walk for less than one block is contradicted by the claimant's exercise stress test from May 2007, where he was noted to walk 3.5 miles (Exhibit 19f/p.27f), and his admission in July 2008 that he was walking 4.5 miles three times per week (Exhibit 19f/p.18). The undersigned additionally notes that Dr. Lojek's comment that the claimant's impairments cause "marked limitation of physical activity" is also contradicted by his report to E. Paul, A.P.R.N. at West Michigan Heart in August 2008 that he is "able to be quite active with good tolerance as he chooses" as well as his report to Dr. Call, another cardiologist at West Michigan Heart, in February 2009 that he had experienced "no recent chest pain with exertion, chest pain at rest, dyspnea with exertion, dyspnea at rest, palpitations, extremity edema, dizziness, or syncope" (Exhibit 19f/pp.7, 9). There is no objective evidence to support Dr. Lojek's comments that the claimant was "incapable of even low stress jobs" and that his cardiac symptoms frequently interfered with attention/concentration during the period of time at issue, nor did Dr. Lojek reference any objective evidence to substantiate these statements. These clearly appear to be overestimations.
>
> The undersigned is aware that in May 2013 Dr. Lojek stated that he considered the claimant a candidate for disability, indicating that it would be "very difficult for him to obtain and maintain a job." The undersigned notes that this statement, which concerns an issue reserved to the Commissioner, is vague and refers to the claimant's current functioning, which is several years after the date he last retained insured status. The undersigned notes that Dr. Lojek further stated that "each time he has had chest pain severe enough to require cardiac catheterization,

> he has been found to have coronary artery disease which has required stenting" (Exhibit 33f). This latter statement, in particular, is not supported by the evidence. Again, as previously discussed, all cardiac catheterizations performed after June 2005 and prior to December 31, 2008 showed adequately patent arteries that required no further stenting. Multiple diagnostic tests also rather consistently showed normal ejection fractions, generally ranging from 55% to 65% or even 70%, despite the claimant's testimony that he continued to smoke cigarettes during this timeframe (Exhibits 9f/p.2, 12f/p.3, 14f/p.8, and 19f/pp.142, 140, 138, 137, 134, 130, 127, 125, 123, 121,119, 118, 117, 115, 113, 112, 107, 105, 103 , 99, 97, 94, 86 , 79, 73 , 47, 6).
>
> In addition, the undersigned notes that in October 2013 Dr. Lojek stated that the claimant "could have a normal stress test from time to time and, at other times an abnormal stress test, but that this does not rule out the fact that his symptoms are problematic and that there is clear objective evidence of an aggressive tendency to re-stenose his coronary arteries" (Exhibit 38f/p.2). The undersigned is aware that the evidence of record indicates that stress test results have varied over the years and that, as previously discussed, the claimant required several stent procedures to his coronary arteries as treatment for his coronary artery disease. However, again, the bulk of these procedures were performed between January and June 2005. All subsequent catheterizations performed prior to December 31, 2008 revealed patent arteries and no evidence of ischemia or obstruction. Cardiac testing also generally revealed normal left ventricular ejection fractions, and physical exams generally revealed no significant clinical findings, such as diminished pulses or peripheral edema. Furthermore, he remained able to perform a significant amount of daily activities during the period of time at issue, per his own admissions, which included walking several miles per week. Therefore, while all of Dr. Lojek's statements have been considered, such do not persuade the undersigned to find that the claimant's ability to perform all work activity was precluded on or before December 31, 2008.

PageID.124-125.

The ALJ gave good reasons for the weight assigned to Dr. Lojek's opinions. As an initial matter, the Court notes that Dr. Lojek did not treat plaintiff during the relevant time period. Thus, Dr. Lojek relied on records prepared by those physicians who actually treated plaintiff during that time frame. For example, Dr. Lojek's March 3, 2011 opinion (Exh. 27F) stated that "Patient's impairments have been in effect since [sic] have been in effect since February, 2005 and as of 12/31/2008 and have continued." PageID.1200. Dr. Lojek opined that during that time period plaintiff could walk less than one block. PageID.1199. However, plaintiff's treating

cardiologist, John D. Call, Jr., M.D., reported in a contemporaneous treatment record from May 15, 2007 that while plaintiff was "complaining of a multitude of aches and pains . . . [h]e hopped on the treadmill and did 3½ miles." PageID.1033. Over a year later, on July 12, 2008, plaintiff reported that he was walking 4.5 miles, three times per week. PageID.1024.

Next, the Court rejects plaintiff's claim that the ALJ "cherry picked" the record because the decision "emphasizes evidence that impugns disability while ignoring evidence that corroborates it." Plaintiff's Brief at PageID.1382. The argument that the ALJ "cherry-picked" the record "can be described more neutrally as weighing the evidence." *White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009). That is exactly what the ALJ did in this case.

Finally, plaintiff takes issue with the ALJ's rejection of Dr. Lojek's opinion that since February 2005, plaintiff's impairments "would likely produce 'good days' and 'bad days,' and would likely cause an absence from work 'more than four times a month.'" "A treating physician's estimate of how often a patient who is not working would likely be absent from work if he had a job is not a medical opinion, and it is not entitled to any particular weight." *Murray v. Commissioner of Social Security*, No. 1:10-cv-297, 2011 WL 4346473 at *7 (W.D. Mich. Aug. 25, 2011), R&R adopted, 2011 WL 4346386 (Sept. 15, 2011). *See also, Valdes v. Commissioner*, No. 1:08-cv-872, 2010 WL 911181 at *8 (W.D. Mich. March12, 2010) ("A treating physician's estimate of how often a patient who is not working would likely be absent from work if she had a job is not a medical opinion") (internal citation omitted). Accordingly, plaintiff's claim of error should be denied.[2]

---

[2] The Court notes that plaintiff included a chart in a footnote which identified "days hospitalized," "heart visits" (with doctor) and "colon visits" (with doctor). According to this chart, plaintiff had 20 days of hospitalization and 6 doctor visits in 2005. Plaintiff's Brief (ECF No. 11, PageID.1382-1383). It is conceivable that plaintiff may have missed 20 days of work in 2005 due to hospitalizations related to the four procedures performed between January and June 2005. At plaintiff's most recent hearing, the vocational expert testified that missing more than two days per month is more absenteeism than employers generally tolerate, and missing four days a month is work preclusive. PageID.254. While plaintiff's absenteeism due to hospitalization in 2005 may have approached the generally acceptable absenteeism

### C. The ALJ gave insufficient reasons to reject claim's reported symptoms and limitations (sometimes referred to as plaintiff's "complaints").

Plaintiff listed seven "insufficient reasons" given by the ALJ for rejecting plaintiff's claims, *see* Plaintiff's Brief at §§ C.1.a through C.1.g, along with three "other defects," *see* Plaintiff's Brief at §§ C.2.a through C.2.c. PageID.1384-1389. Plaintiff also included another argument in a second § C.

#### 1. Plaintiff's credibility

The first seven claims (§§ C.1.a through C.1.g) involve questions of credibility. An ALJ may discount a claimant's credibility where the ALJ "finds contradictions among the medical records, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. "It [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony." *Heston*, 245 F.3d at 536, *quoting Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972). In evaluating a claimant's assertions of pain or ailments, it is appropriate for an ALJ to consider the claimant's household and social activities. *Walters*, 127 F.3d at 532. The Court "may not disturb" an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

Plaintiff's cursory (one to two sentence) arguments appearing in "§ C.1.a "Generally", "§ C.1.b "Findings and Treatment", and, "§ C.1.g "Minimal Reporting", are waived as inadequately briefed. PageID.1384, 1387. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

---

toleration limit, plaintiff did not develop this claim or demonstrate that absenteeism due to the medical procedures lasted for a continuous period of more than 12 months. *See* 20 C.F.R. § 404.1505.

In § C.1.f , plaintiff contends that the ALJ did not adequately address his "Diarrhea Complaints." As discussed in § III.A, *supra*, the ALJ adequately addressed this condition.

In § C.1.c, plaintiff contends that the ALJ did not adequately address his "Periods of Remission" because the ALJ pointed out periods when plaintiff's heart problems were not active, while in § C.1.d plaintiff contends that the ALJ's statement that plaintiff's heart condition was "stable" from 2005 through 2008 was misleading. PageID.122. Plaintiff has not developed these alleged errors in any detail. With respect to both of these issues, the ALJ pointed out that plaintiff's cardiac problems did not require invasive treatment after his four procedures performed between January and June 2005, that his coronary heart disease remained stable, and that by May 2007 plaintiff could walk up to 3.5 miles at a time:

> The undersigned also notes that few emergent visits were sought by the claimant after April 2003 until January 2005, when he underwent angioplasty and stent placement surgeries. As indicated by Dr. Lojek's letter and various hospital records, during the period of time from April 2003 through December 2008, all of the claimant's stent implantation procedures, four in total, were performed between January and June 2005. All subsequent catheterizations performed prior to December 31, 2008 showed adequately patent arteries that required no further invasive treatment. The record clearly shows that after June 2005 through December 2008, while the claimant reported periodic exacerbations of his cardiac symptoms, his coronary artery disease remained stable.
>
> In addition, physical examinations of the claimant during the period of time at issue consistently revealed a regular heartrate and rhythm, equal pulses in the upper and lower extremities, and no evidence of peripheral edema. A very high cardiac functional capacity, as measured by treadmill tests in October 2006, where he achieved 13 METS, and May 2007, where the claimant was able to walk 3.5 miles, is also reflective of stable coronary artery disease, as noted by Dr. Tavel, the medical expert who testified at the claimant's hearings held before Judge Prothro in August 2013 and March 2014. Dr. Tavel, also noted no evidence of a significant reduction of myocardial perfusion on multiple nuclear and echocardiographic stress tests performed subsequent to July 2005. These tests generally revealed normal left ventricular function and wall motion in addition to normal exercise tolerance (Exhibits 3f and 19f/pp.107, 105, 103, 99, 97, 96, 94, 93, 88 - 86).

13

PageID.122. This is not a case where plaintiff's condition remained stable for years at a disabling level. Accordingly, these claims of error should be denied.

In § C.1.e, plaintiff contends that the ALJ failed to properly address his activities of daily living. Plaintiff did not develop this argument in any detail other than to state that "[t]he ALJ points out Plaintiff's activities of daily living (PageID.122)." Plaintiff's Brief at PageID.1386. Plaintiff is apparently referring the following portion of the ALJ's decision:

> The undersigned additionally notes that there is no evidence to show that the claimant reported experiencing severe fatigue, episodes of lightheadedness, or episodes of shortness of breath on a recurrent basis independent of exacerbations of his heart disease during the relevant time period. It is clear that all of these are a constellation of symptoms associated with his coronary artery disease and not attributable to other medical conditions. Furthermore, despite these symptoms, the claimant was apparently able to maintain a significant amount of daily activities during the period of time at issue. Per his own admission, he indicated that he remained able to drive as needed, shop, prepare simple meals, vacuum, load/unload the dishwasher, mow grass, use a snow blower when necessary, and attend to his personal needs without assistance. He stated that he performed all household tasks with rest-breaks as needed and typically walked four times per week for exercise.

PageID.122.

Here, plaintiff's daily activities are not indicative of an individual who is incapable of performing a limited range of work related activities. *See, e.g., Pasco v. Commissioner of Social Security*, 137 Fed. Appx. 828, 846 (6th Cir. 2005) (substantial evidence supported finding that plaintiff was not disabled where plaintiff could "engage in daily activities such as housekeeping, doing laundry, and maintaining a neat, attractive appearance" and could "engage in reading and playing cards on a regular basis, both of which require some concentration") (footnote omitted); *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993) (a claimant's ability to perform household and social activities on a daily basis is contrary to a finding of disability); *Gist v. Secretary of Health and Human Services*, 736 F.2d 352, 358 (6th Cir. 1984) (a claimant's capacity to perform daily activities on a regular basis will militate against a finding of disability).

There is no compelling reason to disturb the ALJ's credibility determinations with respect to these matters. Accordingly, plaintiff's claims of error related to §§ C.1.a through C.1.g should be denied.

### 2.   Other defects in the ALJ's decision

In § C.2.a "Excessive Vagueness," plaintiff contends that at pages 7-10 of his decision (PageID.120-123) "the ALJ frequently recites pieces of evidence that he presumably thinks impugns Plaintiff's credibility, without deigning to explain how or why it does so." Plaintiff's Brief at PageID.1387. Plaintiff provides no specific example of the purported "excessive vagueness" other than listing four pages of the ALJ's decision. Plaintiff's conclusory claim that the ALJ's decision was excessively vague is unaccompanied by any effort at developed argumentation and should be deemed waived. *See McPherson*, 125 F.3d at 995-96.

In § C.2.b, plaintiff contends that the ALJ was engaged in "Doctor Playing." PageID.1388. Here, plaintiff stated that the ALJ "denigrated Plaintiff's heart problems for not producing greater findings and treatment" and "similarly cited lack of prescriptions or specific treatment for diarrhea." *Id*. Plaintiff then cites cases to support the proposition that "[a]n ALJ who uses medical findings and treatment to impugn credibility is therefore guilty of doctor playing." *Id*. Plaintiff's claim is without merit.

"The ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of [his] residual functional capacity." *Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir. 2004). In performing this function, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Commissioner of Social Security*, 342 Fed. Appx. 149, 157 (6th Cir. 2009). The issue raised by

plaintiff is whether the ALJ disregarded the medical opinions in the record and made independent medical findings. As one court explained:

> The Commissioner's determination must be based on testimony and medical evidence in the record. And, as this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.

*Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996).

Here, the ALJ did not make independent medical findings in establishing plaintiff's RFC. Plaintiff's claim appears to arise from the ALJ's discussion of plaintiff's diarrhea noting that scans showed normal liver function. PageID.123. *See* Plaintiff's Brief at PageID.1388. The ALJ's statement was not an "independent medical finding," it was a recitation of medical findings from an ultrasound performed on January 20, 2006 which indicated that plaintiff's "[t]he gallbladder, bile ducts and liver are normal." PageID.891.

In C.2.c, "Cause of Diarrhea," plaintiff contends that the ALJ's discussion regarding the cause of the diarrhea was immaterial and that "doubt over the correct diagnosis is not grounds to discount the condition." Plaintiff's Brief at PageID.1389. The ALJ did not discount plaintiff's recurrent diarrhea for lack of a definitive diagnosis. As discussed, the ALJ reviewed the medical record in an attempt to determine whether plaintiff's recurrent diarrhea caused disabling limitations during the relevant time period. This proved to be a rather difficult task given plaintiff's inconsistent statements and a sparse medical record which did not reflect reports of the diarrhea until May 2008. Accordingly, plaintiff's claim of error should be denied.

Finally, in a second "§ C" entitled "Consequences of Errors," plaintiff contends that the ALJ erred by not giving deference to Dr. Lojek's opinions and plaintiff's statements, that the case should be remanded for a new RFC determination, and that the Court should make a finding of disability as a matter of law because "since the VE admitted that missing more than two days

16

of work a month would eliminate all jobs (PageID.254)." Plaintiff's Brief at PageID.1390. Plaintiff's request for relief should be denied. For the reasons discussed, Dr. Lojek's opinions were not entitled to deference, plaintiff's claims of limitations greater than those set forth in the RFC were not credible, and the record does not support plaintiff's claim that he would miss more than two days of work per month during the relevant time period of April 21, 2003 through December 31, 2008.

### D. The ALJ failed to address regional jobs.

An ALJ's finding that a plaintiff possesses the capacity to perform substantial gainful activity that exists in the national economy must be supported by substantial evidence that the plaintiff has the vocational qualifications to perform specific jobs. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence may be produced through the testimony of a VE in response to a hypothetical question which accurately portrays the claimant's physical and mental limitations. *See Webb*, 368 F.3d at 632. As discussed, the vocational expert (VE) concluded that a person with plaintiff's limitations could perform 1,150,000 jobs in the national economy. PageID.250-251. Plaintiff did not dispute the VE's testimony at the hearing. *See* PageID.245-256. Now, plaintiff seeks a reversal and remand due to the insufficiency of the VE's testimony. This Court has concluded that such a failure to contest the VE's testimony results in a waiver of that claim in a subsequent appeal:

> "The Sixth Circuit, along with other courts across the country, have generally recognized that a claimant's failure to object to testimony offered by a vocational expert, at the time of the administrative proceeding, waives the claimant's right to raise such issues in the district court." *Harris v. Comm'r of Soc. Sec. Admin.*, No. 1:11–cv–1290, 2012 WL 4434078, at *3 (N.D. Ohio Sept. 24, 2012) (citing *Hammond v. Chater*, No. 96–3755, 1997 WL 338719, at *3 (6th Cir. June 18, 1997) (finding the plaintiff's failure to raise objections to the VE's testimony waived the argument on appeal)); *see Lyon v. Comm'r of Soc. Sec.*, No. 1:11-cv-1104, 2013 WL 1149967, at *4 (W.D. Mich. March 19, 2013) (the plaintiff's challenge to the

VE's testimony was waived because she failed to object to the testimony at the administrative hearing).

*Spohn v. Commissioner of Social Security*, No. 1:16-cv-952, 2017 WL 2838235 at *5 (W.D. Mich. July 3, 2017).

Even if plaintiff had raised that issue at the hearing, the ALJ did not err by relying on the VE's testimony that plaintiff could perform over 1,000,000 jobs nationally. "The Commissioner is not required to show that job opportunities exist within the local area." *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999). The applicable statute provides that:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A). The "national" numbers of jobs identified by the vocational expert (PageID.246, 250-251), are presumed to constitute work existing in several regions in the country. *See Gutierrez v. Commissioner of Social Security*, 740 F.3d 519, 529 (9th Cir. 2014) (nationwide figures are assessed "in the context of 'several regions of the country'").

In addition, the regulations provide in pertinent part that:

> Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy". We will not deny you disability benefits on the basis of the existence of these kinds of jobs. If work that you can do does not exist in the national economy, we will determine that you are disabled. However, if work that you can do does exist in the national economy, we will determine that you are not disabled.

20 C.F.R. § 404.1566(b).  Plaintiff has not demonstrated that the identified jobs, i.e., cashier, small product assembler, and inspector/hand packager are "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [he lives]." *See id*.  *See, e.g, Gutierrez*, 740 F.3d at 529 ("A finding of 25,000 jobs likely does not fall into the category of 'isolated jobs' existing in 'very limited numbers.' ").

The 1,150,000 total jobs identified by the VE (PageID.250-251) constitute a significant number of jobs for purposes of a disability claim.  *See, e.g., Harmon*, 168 F.3d at 292 (700,000 jobs in the national economy constituted a significant number).  Accordingly, plaintiff's claim of error should be denied.

### IV.  RECOMMENDATION

For the reasons discussed, I respectfully recommend that the Commissioner's decision be **AFFIRMED**.

Dated: July 23, 2018                             /s/ Ray Kent
                                                 United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).